OPINION
{¶ 1} Defendant-appellant, Ohio Department of Job Family Services ("ODJFS"), appeals from the April 14, 2005 judgment of the Franklin County Court of Common Pleas, in which that court entered judgment as a matter of law in favor of plaintiffs-appellees/cross-appellants, Nickolaus B. Thompson ("Thompson"), Ohio Provider Resource Association ("OPRA"), Guernsey Residential, Inc., St. John's Villa, and Champaign Residential Services, Inc. (referred to collectively hereinafter as "the plaintiffs"), on their claims for declaratory judgment and injunctive relief against ODJFS, the Ohio Department of Mental Retardation and Developmental Disabilities ("ODMRDD"), and defendants-appellees/cross-appellants, Fairfield County Board of Mental Retardation and Developmental Disabilities ("MRDD"), Summit County Board of MRDD, Pickaway County Board of MRDD, and Mid-East Ohio Regional Council (referred to collectively hereinafter as "the boards").
 {¶ 2} This case involves an examination of the administrative roles of ODJFS and the boards with respect to the provision of MRDD services to Medicaid-eligible Ohio recipients through Ohio's Medicaid plan and through federally-approved waivers.
 {¶ 3} Medicaid is a cooperative federal-state program through which the federal government "provides financial assistance to participating States to aid them in furnishing health care to needy persons." Harris v. McRae (1980), 448 U.S. 297, 308,100 S.Ct. 2671, 65 L.Ed.2d 784. Medicaid provides assistance to certain uninsured low-income and medically vulnerable people by providing medically necessary care at no cost. Pursuant to Section 1396d(a)(15), Title 42, U.S. Code, the term "medical assistance" includes payment of part or all of the costs of services in an intermediate care facility for the mentally retarded.
 {¶ 4} States, such as Ohio, that elect to participate in Medicaid must submit for approval a plan that will be effective "in all political subdivisions of the State, and, if administered by them, be mandatory upon them." Section 1396a(a)(1), Title 42, U.S.Code. This is referred to as the "statewideness" requirement. In addition, a state Medicaid plan must "* * * provide for the establishment or designation of a single State agency to administer or to supervise the administration of the plan * * *." Section 1396a(a)(5), Title 42, U.S.Code. This is referred to as the "single state agency" requirement.
 {¶ 5} Pursuant to regulations promulgated under the foregoing statutes, each plan must "be in effect throughout the State" and "in operation statewide through a system of local offices, under * * * standards * * * that are mandatory throughout the State." Section 431.50(a)-(b)(1), Title 42, C.F.R. As well, each state plan must, "[s]pecify a single state agency established or designated to administer or supervise the administration of the plan[.]" Section 431.10(b)(1), Title 42, C.F.R.
 {¶ 6} To this end, R.C. 5111.01 provides, in part:
The department of job and family services shall act as thesingle state agency to supervise the administration of themedicaid program. As the single state agency, the department shall comply with 42 C.F.R. 431.10(e). The department's rules governing medicaid are binding on other agencies that administercomponents of the medicaid program. No agency may establish, by rule or otherwise, a policy governing medicaid that is inconsistent with a medicaid policy established, in rule or otherwise, by the director of job and family services.
(Emphasis added.)
 {¶ 7} In 1981 Congress amended the Social Security Act[1] to permit states to apply for waivers that allow them to deliver services under a relaxed set of regulatory strictures, including home and community-based services ("HCBS") for mentally retarded or developmentally disabled individuals who would otherwise require institutional care. See Section 1396n(c)(1), Title 42, U.S.Code. Under a Section 1396n(c) waiver, certain obligations that otherwise attach to states' provision of Medicaid services are waived in order to allow long-term care services to be delivered in community settings. See Section 1396n(c)(3), Title 42, U.S. Code (detailing the requirements that may be waived under a Section 1396n(c) waiver); see, also, Section 1396n(c)(4)(B) (explaining the services that may be provided under a Section 1396n(c) waiver). State Medicaid agencies submit applications for waivers for review by the Centers for Medicare and Medicaid Services and the applications may be approved for an initial three-year period, followed by renewal for additional five-year periods. Section 1396n(c)(3), Title 42, U.S.Code.
 {¶ 8} "Waivers are intended to provide the flexibility needed to enable States to try new or different approaches to the efficient and cost-effective delivery of health care services, or to adapt their programs to the special needs of particular areas or groups of recipients. Waivers allow exceptions to State plan requirements and permit a State to implement innovative programs or activities on a time-limited basis, and subject to specific safeguards for the protection of recipients and the program." Section 430.21(b), Title 42, CFR.
 {¶ 9} HCBS waivers may include waivers of numerous provisions of Section 1396a, Title 42, U.S. Code, including the statewideness requirement. Section 1396n(c)(3), Title 42 U.S.Code. Importantly, however, HCBS waivers will not be granted unless the state provides satisfactory assurances that necessary safeguards have been taken to protect the health and welfare of individual recipients of services under the waiver, and to assure financial accountability for funds expended with respect to those services. Section 1396n(c)(2), Title 42 U.S.Code.
 {¶ 10} Ohio's statutory scheme includes provisions for controlling the quality of "state plan" (or non-waiver) MRDD services and HCBS waiver services. Among these provisions are those requiring that providers satisfy certain prerequisites in order to be considered a "qualified" provider. For example, a provider must enter into a Medicaid provider agreement with ODJFS. R.C. 5111.21(A)(1). In addition, ODMRDD must certify each provider's credentials. R.C. 5123.045. Finally, a provider must enter into a separate direct service contract ("DSC") with a county board of MRDD respecting each individual recipient of services; furthermore, these service contracts must identify the consumer to be served and the type and quantity of services to be provided. R.C. 5126.05 and 5126.035.
 {¶ 11} The record reveals that Guernsey Residential, Inc., St. John's Villa and Champaign Residential Services, Inc., are parties to provider agreements with ODJFS. These provider agreements do not identify the specific type or quantity of services that each provider will render for any specific individual. The boards' DSCs, however, do contain this type of information. Section 42(B) of H.B. 405, effective December 13, 2001, required that county boards of MRDD and providers revise old service contracts, to the extent that those contracts were inconsistent with federal or state law, in order to comply with the procedural requirements of R.C. 5126.035. That statute contains an extensive list of requirements for DSCs entered into between county boards and providers. The bill required that the revisions be completed no later than July 1, 2002. In response to that mandate the boards developed a standardized model service contract ("MSC").
 {¶ 12} According to the complaint, plaintiff Thompson is an individual Medicaid beneficiary and recipient of Medicaid-funded MRDD services. OPRA is a private, non-profit corporation representing 150 Ohio providers of MRDD services. This case began when Thompson, along with the three aforementioned MRDD service providers and OPRA, brought this action against ODJFS, ODMRDD, and the boards.[2]
 {¶ 13} The plaintiffs generally alleged that: (1) ODMRDD and ODJFS violated Ohio law by not promulgating administrative rules governing DSCs by July 1, 2002; and (2) the boards were without authority to enter into or enforce DSCs until ODMRDD adopted such rules pursuant to R.C. 5126.035(E). The plaintiffs further alleged that, in the absence of those rules, and until such rules were promulgated, any DSC then in existence or implemented in future, would be unlawful.
 {¶ 14} The plaintiffs sought several forms of relief. In Count One, they sought a declaratory judgment that ODJFS and ODMRDD had violated their legal duty to promulgate rules governing DSCs between qualified Medicaid providers and local boards of MRDD, and that, until those rules are promulgated, ODJFS' Medicaid provider agreements constitute valid DSCs and are the only precondition for a provider to be eligible to receive Medicaid reimbursement for MRDD services.
 {¶ 15} In Count Two the plaintiffs sought a declaratory judgment that the Ohio Association of County Boards of MRDD and the Ohio Superintendents of County Boards of MRDD have no authority to promulgate or impose their own agreements, and that, in the absence of rules governing DSCs between providers and local boards, ODJFS' Medicaid provider agreements are the only precondition for a provider to be eligible to receive Medicaid reimbursement for services rendered in a given county.
 {¶ 16} In Count Three the plaintiffs sought a declaratory judgment that the boards cannot: (1) enforce their own existing DSCs, (2) force providers to renew such contracts, (3) establish new DSCs until the rules are promulgated pursuant to the then-applicable version of R.C. 5126.035, or (4) establish any DSCs that conflict with ODMRDD rules. They also sought a declaration that ODJFS' Medicaid provider agreements are the only precondition for a provider to be eligible to receive Medicaid reimbursement for services rendered in a given county.
 {¶ 17} In Count Four the plaintiffs sought injunctive relief against the Ohio Association of County Boards of MRDD and the Ohio Superintendents of County Boards of MRDD, corresponding with the declaratory relief sought in Count Two.
 {¶ 18} In Count Five the plaintiffs sought injunctive relief against the boards corresponding to the declaratory relief sought in Count Three; specifically, an injunction ordering the boards (a) not to promulgate or implement any DSC not issued according to ODMRDD rules; (b) not to enforce any existing DSC containing unlawful provisions that interfere with MRDD service recipients' right to freely choose willing providers, that interfere with an individual's services, that reduce the number of services that a provider can furnish to a recipient, that disturb the statewide uniformity of Ohio's Medicaid program, that interfere with providers' rights under their ODJFS provider agreements, that permit county boards to withhold payment for services rendered in accordance with individuals' service plans, or that permit county boards to refuse to negotiate increases in reimbursement amounts as authorized by law; (c) not to rescind, revoke or modify individual service needs addenda ("ISNA") that are the product of choices made by recipients of Medicaid-eligible MRDD services; (d) not to remove providers from the counties' provider pools; (e) not to retaliate against providers for not signing the boards' DSCs; and (f) to give full force and effect to providers' agreements with ODJFS in lieu of DSCs entered into pursuant to the not-yet-promulgated ODMRDD rules.
 {¶ 19} On March 30, 2004, the boards moved for judgment on the pleadings and summary judgment. They argued, inter alia, that the plaintiffs lacked standing to pursue their claims. On July 2, 2004, ODJFS and ODMRDD filed a motion for summary judgment in which they pointed out that the administrative rules that the plaintiffs alleged had not been promulgated had indeed been promulgated during the pendency of the lawsuit, and became effective on July 2, 2004. The two state agencies advised the court that they agreed with the plaintiffs' position that "a Medicaid provider agreement is the only agreement that is necessary for a Medicaid provider to obtain Medicaid payment for services to an eligible Medicaid recipient." On November 24, 2004, the plaintiffs filed their own motion for summary judgment.
 {¶ 20} By decision dated December 29, 2004, the court of common pleas denied the boards' and the state agencies' motions and granted in part the plaintiffs' motion for summary judgment. The court determined that the plaintiffs do have standing to pursue their claims. The court denied as moot the plaintiffs' motion for summary judgment as to the portion of Count One of the complaint dealing with promulgation of rules because the required rules were promulgated during the pendency of the lawsuit. The court granted the plaintiffs' motion with respect to the remaining issue under Count One, declaring that an ODJFS Medicaid provider agreement is the only agreement necessary for a provider to obtain Medicaid reimbursement for services rendered to eligible Medicaid recipients. The court also granted the plaintiffs' motion for summary judgment as to Counts Three and Five, which sought declaratory and injunctive relief against the boards. Finally, the court denied the defendants' dispositive motions.
 {¶ 21} The court's decision included a lengthy discussion of the issues the parties had raised during the summary judgment briefing process. The court concluded its decision by stating, "[t]he parties shall cooperate to prepare a proper judgment entry to avoid any unnecessary binding of the State defendants in a manner that would result in a loss of Medicaid funding. Said entry shall be filed in accordance with Loc.R. 25.01."
 {¶ 22} Following the release of the court's decision, its author, the Honorable Patrick McGrath, took a seat on the Tenth District Court of Appeals, having been duly elected in November 2004, whereupon the Honorable Julie M. Lynch assumed Judge McGrath's former seat on the Franklin County Court of Common Pleas. The record reveals that throughout the month of January 2005, the parties circulated proposed judgment entries pursuant to Loc.R. 25.01, but were unable to agree upon language to present to the court. Accordingly, also pursuant to Loc.R. 25.01, the parties submitted their proposed judgment entries to Judge Lynch.
 {¶ 23} The parties' proposed judgment entries do not differ in their treatment of Count One of the complaint. Further, though the plaintiffs' proposed judgment entry contains more substantive provisions with respect to Counts Three and Five, that judgment entry contains language virtually identical to that contained in the proposed judgment entry submitted by ODJFS and ODMRDD. The critical differences between the plaintiffs' and the state agencies' proposed entries, and the boards' proposed entry, concern whether, and the extent to which, the boards possess any authority to directly contract with providers.
 {¶ 24} For instance, with respect to Count Three, the state agencies' proposal states that (1) R.C. 5126.055 is preempted by federal law, (2) service contracts between county MRDD boards and providers are void and unenforceable, (3) county MRDD boards have no authority to enforce, renew or require that providers enter into, service contracts with such boards, and (4) "Defendant Boards have no authority to require any other substantive requirement of providers that is either in conflict with, or in addition to, the Medicaid requirements under federal law, and state law to the extent it is not preempted by federal law[.]" On the other hand, the boards' proposal with respect to Count Three states that, "(a) the Defendant Boards may only enter into, renew, and/or enforce service contracts that do not conflict with, add requirements to, or otherwise violate federal or state law; (b) the Defendant Boards may not require providers to enter into service contracts, enforce existing service contracts, or renew existing service contracts that conflict with, add requirements to, or otherwise violate federal or state law[.]"
 {¶ 25} On April 14, 2005, Judge Lynch journalized a judgment entry the language of which is identical to that proposed by the boards. This entry included the court's finding that the plaintiffs had standing to assert their claims. ODJFS timely appealed and advances a single assignment of error, as follows:
The lower court erred by declaring county boards of mental retardation and developmental disabilities may enter into, renew, and/or enforce service contracts that do not conflict with, add requirements to, or otherwise violate federal or state law.
 {¶ 26} The plaintiffs timely filed a notice of cross-appeal, and advance the following assignment of error:
The substitute trial judge erred by filing an ambiguous judgment entry that does not accord with the findings and decision filed by the original trial judge.
 {¶ 27} Finally, the boards timely filed a notice of cross-appeal, and advance three assignments of error, as follows:
1. The trial court erred in denying defendants-appellees/cross-appellants' Fairfield, Summit and Pickaway County Boards of MRDD, and Mid-East Ohio Regional Council's motion for summary judgment.
2. The trial court erred in granting summary judgment in favor of plaintiffs-appellees/cross-appellants and in finding that a Medicaid provider agreement is all that is necessary for a provider to obtain Medicaid payment for rendering services in lieu of a lawful service contract.
3. The trial court erred in finding that plaintiffs had standing.
 {¶ 28} We begin with ODJFS' appeal. Because the parties did not address the issue in their briefs we questioned ODJFS at oral argument about whether it has standing to bring its appeal. "[T]he issue of standing, inasmuch as it is jurisdictional in nature, may be raised at any time during the pendency of the proceedings." New Boston Coke Corp. v. Tyler (1987),32 Ohio St.3d 216, 218, 513 N.E.2d 302. ODJFS conceded that its appeal is taken only from the portion of the judgment entered against the boards. However, it explained that during the course of the proceedings below, its position ultimately aligned with that of the plaintiffs.
 {¶ 29} "Appeal lies only on behalf of a party aggrieved by the final order appealed from. Appeals are not allowed for the purpose of settling abstract questions, but only to correct errors injuriously affecting the appellant." Ohio ContractCarriers Assn. v. Pub. Util. Comm. (1942), 140 Ohio St. 160,23 O.O. 369, 42 N.E.2d 758, syllabus. "Under the common law, it is well settled that the right to appeal can be exercised only by those parties who are able to demonstrate a present interest in the subject matter of the litigation which has been prejudiced by the judgment of the lower court." Willoughby Hills v. C.C. Bar'sSahara, Inc. (1992), 64 Ohio St.3d 24, 26, 591 N.E.2d 1203.
 {¶ 30} In order to have standing to appeal, the injury to the appellant "must be concrete and not simply abstract or suspected." Ohio Contractors Assn. v. Bicking (1994),71 Ohio St.3d 318, 320, 643 N.E.2d 1088. This court has also held, "basic to the establishment of standing is that the challenged action has caused, or will cause, the appellant injury in fact, economic or otherwise, and that the interest sought to be protected is within the realm of interests regulated or protected by the statute or constitutional right being challenged." Franklin Co.Regional Solid Waste Auth. v. Schregardus (1992),84 Ohio App.3d 591, 599, 617 N.E.2d 761.
 {¶ 31} Generally, a government agency does not have the right to appeal a trial court's decision that is adverse to it when the judgment is rendered upon an appeal from a decision of that agency. See, e.g., Corn v. Bd. of Liquor Control (1953),160 Ohio St. 9, 17, 50 O.O. 479, 113 N.E.2d 360. The present appeal, however, does not involve an order or decision of ODJFS.
 {¶ 32} The Seventh Appellate District has held that a state agency may appeal a court of common pleas judgment not rendered on an appeal from the agency's order when the court's judgment would require the agency to violate the law. In Snyder v.Snyder, 7th Dist. No. 04JE16, 2004-Ohio-7216,[3] the court held that the Ohio Public Employees Retirement System ("OPERS") had standing to appeal from a domestic relations court order that deemed OPERS a constructive trustee of an ex-wife's portion of her deceased ex-husband's retirement benefits, and ordered OPERS to distribute pension proceeds to the ex-wife in accordance with the provisions of the couple's divorce decree, despite the fact that the ex-husband had never named the ex-wife as a beneficiary, as required by the decree.
 {¶ 33} OPERS sought to appeal because the decree failed to contain the elements required for distribution, pursuant to R.C.3105.82. The court of appeals found standing because OPERS had participated in the lower court proceedings as a third-party defendant and because OPERS was aggrieved by the trial court's decision insofar as the decision, "in effect, required [OPERS] to violate the law." Id. at ¶ 12.
 {¶ 34} In the instant case we fail to perceive any manner in which ODJFS is aggrieved by the language of the judgment subject of ODJFS' appeal. The portion of the judgment from which ODJFS appeals was not rendered against that agency; it was only rendered against the boards. Furthermore, unlike the situation that OPERS faced in Snyder, the judgment in this case does not force ODJFS to violate any statute or regulation. ODJFS' appeal is premised upon the notion that the trial court's language would allow the boards to unlawfully act pursuant to a statutory scheme that, according to ODJFS, is wholly preempted by federal law.
 {¶ 35} However, even assuming this position is correct, a trial court order allowing other parties to violate the law is distinguishable from the situation that the Snyder court found favored standing — that the court's judgment required the stateagency to violate the law. For the foregoing reasons, we find that ODJFS lacks standing to bring its appeal; therefore, we dismiss the same.
 {¶ 36} Next we turn to the plaintiffs' cross-appeal. In support of their single assignment of error they argue that the judgment should be vacated because Judge Lynch journalized a judgment that is ambiguous and does not comport with Judge McGrath's findings and decision.
 {¶ 37} Even assuming that the judgment entry and the decision conflict, the plaintiffs' assignment of error is without merit. It has long been held in Ohio that, "a court speaks only through its journal, and where its opinion and its journal are in conflict the latter controls and the former must be disregarded."Andrews v. Bd. of Liquor Control (1955), 164 Ohio St. 275,58 O.O. 51, 131 N.E.2d 390, paragraph three of the syllabus. See, also, Will v. McCoy (1939), 135, Ohio St. 241, 14 O.O. 85,20 N.E.2d 371, paragraphs one and two of the syllabus; Rosengartenv. Huntington Natl. Bank (Dec. 20, 1977), 10th Dist. No. 77AP-517; Zarachowicz v. Bd. of Liquor Control (1963),119 Ohio App. 133, 136, 26 O.O.2d 331, 197 N.E.2d 370. Indeed, "* * * the opinion of the trial court is not under review. It is the judgment of that court and not its opinion that is the subject of review." In re Estate of Gardner (1959), 112 Ohio App. 462,465, 16 O.O.2d 349, 176 N.E.2d 316, rehearing denied (1960),112 Ohio App. 462, 16 O.O.2d 349, 176 N.E.2d 316.
 {¶ 38} Accordingly, we are constrained to review only the judgment entry and need not examine or resolve any discrepancy between it and the earlier written decision. For that reason the plaintiffs' assignment of error is overruled.
 {¶ 39} We now turn to the boards' cross-appeal. Before we reach the merits thereof, we must first address the plaintiffs' argument that because the boards did not file a notice of appeal, but filed only a notice of cross-appeal, they are only entitled to defend the judgment below, and are not entitled to the reversal thereof that they seek.
 {¶ 40} The plaintiffs direct our attention to App.R. 3(C)(1), which provides:
Cross appeal required. A person who intends to defend a judgment or order against an appeal taken by an appellant and who also seeks to change the judgment or order or, in the event the judgment or order may be reversed or modified, an interlocutory ruling merged into the judgment or order, shall file a notice of cross appeal within the time allowed by App.R. 4.
 {¶ 41} In response, the boards argue that because they "lost" at summary judgment, but "won" a vital point regarding whether DSCs, in principle, are permissible, they are indeed seeking to defend the trial court's judgment (in part) and to change it to enlarge their own rights and to lessen the plaintiffs' rights.
 {¶ 42} App.R. 3(C) is inappropriately invoked because the boards have not attempted to defend the trial court's judgment or an interlocutory ruling merged therein. Applicable here is R.C.2505.04, which provides, "[a]n appeal is perfected when a written notice of appeal is filed * * * in accordance with the Rules of Appellate Procedure * * *." Additionally, App.R. 4(B)(1) provides:
Multiple or cross appeals. If a notice of appeal is timely filed by a party, another party may file a notice of appeal within the appeal time period otherwise prescribed by this rule or within ten days of the filing of the first notice of appeal.
 {¶ 43} The record reveals that ODJFS filed its notice of appeal on May 10, 2005, and that the boards filed their notice of cross-appeal on May 20, 2005. The notice of cross-appeal states that the boards appeal from the same April 14, 2005 judgment from which ODJFS had appealed, and the boards attached a copy of that judgment to their notice of cross-appeal.[4] The boards complied with the requirements of App.R. 4(B) in seeking to appeal from (that is, obtain reversal of) the trial court's judgment granting summary judgment in favor of the plaintiffs and denying the boards' motion for summary judgment. Accordingly, their appeal is properly before this court.
 {¶ 44} We begin our discussion of the merits of the boards' cross-appeal by addressing their third assignment of error first. In support thereof, the boards argue that the trial court erred in finding that the plaintiffs have standing to bring the claims contained in the complaint. The parties fully briefed the standing issue in the court below.
 {¶ 45} The boards argued that neither Thompson nor any plaintiff-provider had standing to assert the claims contained in the complaint. Specifically, the boards argued that Thompson is not served by any of the defendant boards and does not allege that they serve him. Moreover, the boards argued, none of the plaintiff providers was a party to, or had sought to be a party to, a service contract with any of the defendant boards.
 {¶ 46} In support of this argument, the boards submitted with their motion for summary judgment the affidavit of the superintendent of each of the boards. The superintendents averred that Thompson was not eligible to receive MRDD services in their respective counties. The superintendents also averred that the boards had never entered into a service contract with any of the plaintiff providers and that none of the plaintiff providers had ever sought such a contract from the boards.
 {¶ 47} In response, the plaintiffs pointed out that, by an August 28, 2003 order, the trial court allowed the addition of all providers who are members of plaintiff OPRA, including some who provide MRDD services to Medicaid-eligible recipients in Fairfield, Pickaway and Summit counties, as plaintiffs in the action, in order to amend the pleadings to conform to the evidence.
 {¶ 48} They argued that even if all member providers had not been added as plaintiffs, OPRA would still have standing to bring the claims on behalf of all of its members, even in the absence of an injury to itself. They attached to their memorandum in opposition the affidavit of Maureen Corcoran, who averred therein that she is the president of legislative and governmental affairs for OPRA. She stated that eight separately named OPRA members have contracts with the Summit County Board of MRDD, three OPRA members have contracts with the Fairfield County Board of MRDD, and one member has a contract with the Pickaway County Board of MRDD.
 {¶ 49} Ms. Corcoran averred that she is aware that many OPRA members have been advised by "various County Boards of MR/DD" that if the providers do not sign the MSC they face being paid less for services than will be paid to providers who do sign, and possibly losing reimbursement altogether for MRDD services provided to Medicaid-eligible individuals.
 {¶ 50} The plaintiffs also attached the affidavit of Barbara Campbell, who identifies herself therein as the chief executive officer of the Union House, a member of OPRA and a licensed and certified MRDD provider. Ms. Campbell further avers that Union House's principal place of business is located in Fairfield County, Ohio, and it receives Medicaid payments for services that it renders to eligible recipients of Medicaid MRDD services in Fairfield County, Ohio. She also stated that Union House is licensed by ODMRDD, has a provider agreement with ODJFS and has a service contract with the Mid-East Ohio Regional Council ("MEORC"), a council of governments that formerly included the Fairfield County Board of MRDD.
 {¶ 51} Ms. Campbell stated that after the Fairfield County Board of MRDD withdrew from MEORC and presented Union House with a service contract, Union House refused to execute it. Thereafter, according to Ms. Campbell, the Fairfield County Board of MRDD informed Union House that the board would no longer pay for Medicaid services rendered by Union House to Medicaid-eligible individuals residing in Fairfield County.
 {¶ 52} The plaintiffs did not discuss whether Thompson has an interest in the litigation sufficient to confer standing to bring the claims in the complaint.
 {¶ 53} In reply to the plaintiffs' memorandum in opposition, the boards argued that the plaintiff-providers cannot bring any claim based upon violation of recipients' right to free choice of provider because providers are not intended beneficiaries of that right. The boards went on to argue that because Thompson is neither served by or currently eligible for services from any of the defendant-boards, he, too, lacks standing to assert a claim that DSCs offered and entered into by the boards deprives him of any right to free choice of provider.
 {¶ 54} The boards pointed out that the plaintiffs do not challenge the fact that none of the named plaintiff providers have contractual relationships with any of the defendant boards, and also do not challenge the fact that Thompson is not eligible to receive MRDD services in Fairfield, Pickaway or Summit counties. They also argued that the language of the August 28, 2003 consent order clearly indicates that OPRA members were included as plaintiffs only for purposes of availing themselves of the limited protection of that order. The order did not amend the pleadings to conform to the evidence, as the plaintiffs maintained. Finally, the boards urged that the Campbell and Corcoran affidavits are insufficient to demonstrate that any member of OPRA has a claim for actual or threatened injuries against any of the boards such as would confer standing upon OPRA to bring claims on behalf of its members.
 {¶ 55} It is undisputed that Thompson does not seek or receive MRDD services in Summit, Pickaway or Fairfield counties. Thus, he lacks standing to bring his claims against any of the defendant boards. Likewise, none of the three named plaintiff-providers contracts with or has sought to contract with any of the defendant boards; thus, they, too, lack standing, in their own right, to assert the claims in the complaint against the boards. As such, the trial court should have granted the boards' motion for judgment on the pleadings with respect to these plaintiffs.
 {¶ 56} The remaining plaintiff, OPRA, is a trade association. It has not alleged any injury to itself, but a trade association that has not suffered any injury nonetheless has standing on behalf of its members if (a) its members would otherwise have standing to sue in their own right; (b) the interests the association seeks to protect are germane to the association's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. Hunt v. Washington State Apple Advertising Comm.
(1977), 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383; OhioHosp. Assoc. v. Community Mut. Ins. Co. (1987),31 Ohio St.3d 215, 218, 31 OBR 411, 509 N.E.2d 1263.
 {¶ 57} "However, to have standing, the association must establish that its members have suffered actual injury." OhioContractors Assn. v. Bicking (1994), 71 Ohio St.3d 318, 320,643 N.E.2d 1088, citing Simon v. E. Kentucky Welfare Rights Org.
(1976), 426 U.S. 26, 40, 96 S.Ct. 1917, 48 L.Ed.2d 450. Thus, "[t]he association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." Warthv. Seldin (1975), 422 U.S. 490, 511, 95 S.Ct. 2197,45 L.Ed.2d 343, citing Sierra Club v. Morton (1972), 405 U.S. 727,734-741, 92 S.Ct. 1361, 31 L.Ed.2d 636.
 {¶ 58} In this case OPRA has demonstrated that at least one of its members, Union House, has suffered and/or will likely suffer in the immediate future, actual injury as a result of the boards' use of the DSCs that OPRA alleges are unlawful. Moreover, the interests OPRA is seeking to protect are germane to the organization's purpose. In addition, neither the claims asserted nor the relief sought requires the participation of individual members in the lawsuit. Therefore, OPRA meets the test for standing set forth in Hunt and Ohio Hosp. Assn.
 {¶ 59} The boards argue that OPRA still does not have standing because providers may not mount challenges based on the principles of free choice and statewideness because those provisions were enacted for the benefit of recipients, not providers. The boards direct our attention to several decisions of various federal trial courts in which those courts have so stated. They also cite to the case of O'Bannon v. Town CourtNursing Center (1980), 447 U.S. 773, 785, 100 S.Ct. 2467,65 L.Ed.2d 506. However, that case involved whether the "free choice of provider" provision may be read to confer upon nursing home residents the right to choose their nursing home absolutely free of government interference, so as to bar the Government from decertifying a nursing home that is out of compliance with numerous statutory requirements for participation in the Medicare program. The United States Supreme Court in O'Bannon did not hold that the free choice provision is unenforceable by providers.
 {¶ 60} Our research reveals no precedent binding upon this court that holds that providers may not base challenges on the free choice or statewideness provisions of the Social Security Act, and we are unpersuaded that this is a proper basis upon which to find that OPRA lacks standing to bring its claims against the boards. Accordingly, for all the reasons here stated, we overrule the boards' third assignment of error insofar as we have determined that OPRA has standing to pursue its claims.
 {¶ 61} Accordingly, the boards' third assignment of error is sustained as it relates to Thompson and the three plaintiff-providers, and is overruled with respect to OPRA.
 {¶ 62} We now turn to the boards' first and second assignments of error. In support of their first assignment of error, the boards argue that the trial court erred in denying their motion for summary judgment. In their second assignment of error, the boards argue that the trial court erred in granting the plaintiffs' motion for summary judgment.
 {¶ 63} We review the trial court's grant of summary judgment de novo. Coventry Twp. v. Ecker (1995), 101 Ohio App.3d 38,654 N.E.2d 1327. Summary judgment is proper only when the party moving for summary judgment demonstrates: (1) no genuine issue of material fact exists, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds could come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, when the evidence is construed in a light most favorable to the nonmoving party. Civ.R. 56(C); State ex rel. Grady v. State Emp.Rels. Bd. (1997), 78 Ohio St.3d 181, 183, 677 N.E.2d 343. We review questions of law de novo. Nationwide Mut. Fire Ins. Co.v. Guman Bros. Farm (1995), 73 Ohio St.3d 107, 108,652 N.E.2d 684, citing Ohio Bell Tel. Co. v. Pub. Util. Comm. (1992),64 Ohio St.3d 145, 147, 593 N.E.2d 286.
 {¶ 64} The parties' summary judgment motions focused upon Counts Three and Five of the complaint, in which the plaintiffs sought declaratory and injunctive relief against the boards. Specifically, in Count Three the plaintiffs sought a judgment declaring that:
[the boards] cannot enforce unlawful existing service contracts; cannot force providers to renew existing contracts or any related documents, cannot promulgate new service contracts or a GOA [general operating agreement] or any other related documents that do not comport with ODMRDD rules; must give providers lawful service contracts; and that ODJFS Provider Agreements are valid service contracts for providers in lieu of lawful service contracts or GOAs promulgated pursuant to ODMRDD rules.
(Complaint, at 24.)
 {¶ 65} In Count Five, the plaintiffs sought a temporary restraining order and a preliminary and permanent injunction ordering the boards:
(a) not to promulgate or implement any service contract or GOA that is not issued pursuant to ODMRDD rules;
(b) not to enforce any existing service contract that includes unlawful provisions that:
(i) interfere with the right of individuals with MRDD to freely choose willing providers[;]
(ii) permit county boards, in their sole discretion and without regard to an individual's choice of provider, to interfere with individual service needs addenda, and without notice, nor (sic) without regard to an individual's service needs, to reduce the number of services that a provider can furnish to an individual with MRDD;
(iii) violate the uniform statewide administration of Ohio's Medicaid program;
(iv) interfere with providers' right to render Medicaid MRDD services pursuant to their ODJFS Provider Agreements;
(v) interfere with providers' ODJFS Provider Agreements and ODMRDD-issued licenses and certifications;
(vi) permit county boards to withhold or fail to approve payment for services rendered in accordance with approved individual service plans;
(vii) permit county boards to unreasonably deny or refuse to negotiate increases in providers' reimbursement amounts as authorized by law.
(c) not to rescind, revoke, or modify individual service needs addenda, in violation of the choices made by an individual with MRDD;
(d) not to remove providers from their provider pools; and
(e) not to retaliate against providers in any way. And to order Defendant Boards to recognize, acknowledge, and give force and effect to ODJFS Provider Agreements as valid service contracts under Ohio law in lieu of lawful service contracts or GOAs promulgated pursuant to ODMRDD rules.
(Id. at 25-26.)
 {¶ 66} Resolution of the issues raised in the boards' first and second assignments of error requires a review of the applicable state and federal statutory schemes. As noted earlier, Section 431.50(a)-(b), Title 42, C.F.R., requires that each state's plan must provide for the "designation of a single State agency to administer or to supervise the administration of the plan." (Emphasis added.) In accordance with that mandate, R.C. 5111.01 provides that ODJFS "shall act as the single state agency to supervise the administration of the medicaid program * * * [and its] rules governing medicaid are binding on other agencies that administer components of the medicaid program." Section 5111.91 of the Ohio Revised Code authorizes ODJFS to enter into interagency agreements with political subdivisions for administration of one or more components of the Medicaid program, or one or more aspects of a component of the program.
 {¶ 67} The various county boards of MRDD are statutorily charged with administering and co-administering specific components of Ohio's Medicaid program. For instance, each county board of MRDD is required to, "plan and set priorities based on available resources for the provision of facilities, programs, and other services to meet the needs of county residents who are individuals with mental retardation and other developmental disabilities * * *." R.C. 5126.04(A). This duty is to be discharged in accordance with rules that ODMRDD may adopt pursuant to R.C. 5126.04(B).
 {¶ 68} County boards of MRDD are also charged with making eligibility determinations in accordance with the definition of "developmental disability" found in R.C. 5126.01. R.C.5126.041(B). In addition, R.C. 5126.05 sets forth other powers and duties of county boards of MRDD. It provides, in relevant part:
(A) Subject to the rules established by the director of mental retardation and developmental disabilities pursuant to Chapter 119. of the Revised Code for programs and services offered pursuant to this chapter, and subject to the rules established by the state board of education pursuant to Chapter 119. of the Revised Code for programs and services offered pursuant to Chapter 3323. of the Revised Code, the county board of mental retardation and developmental disabilities shall:
(1) Administer and operate facilities, programs, and services as provided by this chapter and Chapter 3323. of the Revised Code and establish policies for their administration and operation;
(2) Coordinate, monitor, and evaluate existing services and facilities available to individuals with mental retardation and developmental disabilities;
(3) Provide early childhood services, supportive home services, and adult services, according to the plan and priorities developed under section 5126.04 of the Revised Code;
(4) Provide or contract for special education services pursuant to Chapters 3317. and 3323. of the Revised Code and ensure that related services, as defined in section 3323.01 of the Revised Code, are available according to the plan and priorities developed under section 5126.04 of the Revised Code;
(5) Adopt a budget, authorize expenditures for the purposes specified in this chapter and do so in accordance with section319.16 of the Revised Code, approve attendance of board members and employees at professional meetings and approve expenditures for attendance, and exercise such powers and duties as are prescribed by the director;
* * *
(8) Provide service and support administration in accordance with section 5126.15 of the Revised Code;
(9) Certify respite care homes pursuant to rules adopted under section 5123.171 [5123.17.1] of the Revised Code by the director of mental retardation and developmental disabilities.
 {¶ 69} R.C. 5126.051(A) provides that, "[t]o the extent that resources are available, a county board of mental retardation and developmental disabilities shall provide for or arrange residential services and supported living for individuals with mental retardation and developmental disabilities." County boards of MRDD may also arrange for job training, vocational evaluation and community employment services for certain mentally retarded and developmentally disabled adults. R.C. 5126.051(B)(2).
 {¶ 70} Section 5126.055(A) of the Ohio Revised Code confers upon county boards of MRDD the "medicaid local administrative authority," which requires a county board of MRDD to do all of the following for individuals with MRDD who reside within the county and who seek or receive HCBS pursuant to a federally approved waiver:
(1) Perform assessments and evaluations of the individual. As part of the assessment and evaluation process, the county board shall do all of the following:
(a) Make a recommendation to the department of mental retardation and developmental disabilities on whether the department should approve or deny the individual's application for the services, including on the basis of whether the individual needs the level of care an intermediate care facility for the mentally retarded provides;
(b) If the individual's application is denied because of the county board's recommendation and the individual requests a hearing under section 5101.35 of the Revised Code, present, with the department of mental retardation and developmental disabilities or department of job and family services, whichever denies the application, the reasons for the recommendation and denial at the hearing;
(c) If the individual's application is approved, recommend to the departments of mental retardation and developmental disabilities and job and family services the services that should be included in the individual's individualized service plan and, if either department approves, reduces, denies, or terminates a service included in the individual's individualized service plan under section 5111.871 of the Revised Code because of the county board's recommendation, present, with the department that made the approval, reduction, denial, or termination, the reasons for the recommendation and approval, reduction, denial, or termination at a hearing under section 5101.35 of the Revised Code.
* * *
(3) In accordance with the rules adopted under section 5126.046
of the Revised Code, perform the county board's duties under that section regarding assisting the individual's right to choose a qualified and willing provider of the services and, at a hearing under section 5101.35 of the Revised Code, present evidence of the process for appropriate assistance in choosing providers;
(4) Unless the county board provides the services under division (A)(5) of this section, contract with the person orgovernment entity the individual chooses in accordance with section 5126.046 of the Revised Code to provide the services ifthe person or government entity is qualified and agrees toprovide the services. The contract shall contain all theprovisions required by section 5126.035 of the Revised Code and require the provider to agree to furnish, in accordance with the provider's medicaid provider agreement and for the authorized reimbursement rate, the services the individual requires.
(5) If the county board is certified under section 5123.16 of the Revised Code to provide the services and agrees to provide the services to the individual and the individual chooses the county board to provide the services, furnish, in accordance with the county board's medicaid provider agreement and for the authorized reimbursement rate, the services the individual requires;
(6) Monitor the services provided to the individual and ensurethe individual's health, safety, and welfare. The monitoring shall include quality assurance activities. If the county board provides the services, the department of mental retardation and developmental disabilities shall also monitor the services.
(7) Develop, with the individual and the provider of the individual's services, an effective individualized service plan that includes coordination of services, recommend that the departments of mental retardation and developmental disabilities and job and family services approve the plan, and implement the plan unless either department disapproves it;
(8) Have an investigative agent conduct investigations under section 5126.313 of the Revised Code that concern the individual;
(9) Have a service and support administrator perform the duties under division (B)(9) of section 5126.15 of the Revised Code that concern the individual.
(Emphases added.)
 {¶ 71} Section 5126.046(A) of the Ohio Revised Code requires that all county boards with Medicaid local administrative authority for habilitation, vocational, or community employment services create a list of all persons and government entities eligible to provide such services and make the list available to each county resident with MRDD who is eligible to receive services through the Medicaid program. That statute further specifies that each eligible county resident with MRDD "may choose the provider of the services." If a county board with Medicaid local administrative authority for HCBS violates an individual's right to choose a qualified provider of services, the individual is entitled to notice of an opportunity to request a hearing pursuant to R.C. 5101.35. R.C. 5126.046(C). Pursuant to R.C. 5111.85, ODJFS may adopt rules governing the administration of the waiver components of Ohio's Medicaid program.
 {¶ 72} County boards are to perform their duties under the Medicaid local administrative authority conferred by R.C.5126.055(A) in accordance with each county board's plan approved by ODMRDD,[5] as well as "[a]ll applicable federal and state laws[,]" all applicable policies of ODMRDD, ODJFS and the federal department of health and human services, and, "(4) [t]hedepartment of job and family services' supervision under itsauthority under section 5111.01 of the Revised Code to act as thesingle state medicaid agency" and "(5) [t]he department of mental retardation and developmental disabilities' oversight." R.C. 5126.055(B). (Emphasis added.)
 {¶ 73} Pursuant to R.C. 5126.05(C), "[a]ny county board may enter into contracts with other such boards and with public or private, nonprofit, or profit-making agencies or organizations of the same or another county, to provide the facilities, programs, and services authorized or required, upon such terms as may be agreeable, and in accordance with this chapter * * *."
 {¶ 74} The boards filed their motion for summary judgment on March 30, 2004, before ODMRDD and ODJFS promulgated rules governing service contracts. In their motion the boards pointed out that the plaintiffs were seeking a declaration that the MSC was unlawful and unenforceable for two reasons: (1) because it was being used when ODMRDD had not yet promulgated rules governing service contracts, and (2) because it allegedly interfered in multiple ways with the proper operation of Ohio's Medicaid system.
 {¶ 75} In seeking summary judgment with respect to Count Three of the complaint, the boards argued that they are permitted to enter into individual DSCs without regard to whether ODMRDD has promulgated a rule governing these contracts because the MSC comports with the requirements of R.C. 5126.035(B)-(D). The boards argued that the adoption of rules governing DSCs is not a condition precedent to the lawful negotiation and implementation of Medicaid DSCs because the statute provides adequate guidance as to the substance of the DSCs. So long as the DSCs constitute the boards' exercise of their authority in a reasonable way and in a manner consistent with the objectives and standards that the controlling statutes impose, the boards argued, such contracts are lawful and enforceable.
 {¶ 76} The controlling statutes impose a number of requirements relative to DSCs. Former R.C. 5126.035(B) required that DSCs comply with rules adopted pursuant to former R.C.5126.035(E).[6] The former and current requirements of the statute require that DSCs comply with statewide Medicaid requirements and contain a general operating agreement ("GOA") component and an ISNA.[7] R.C. 5126.035(B).
 {¶ 77} Next, R.C. 5126.035(C) requires that the GOA component include provisions identifying the county board's role and responsibilities regarding services for individuals with MRDD who reside in the county; identifying the provider's obligations to the consumer served by the contract, as specified in the ISNA; identifying procedures for the county board to monitor the services rendered; specifying procedures through which the county board will evaluate the quality of care and the cost effectiveness of the provider's services; specifying payment, claims and fiscal management procedures; specifying procedures for developing and updating customers' individual service plans and for ensuring service recipients are afforded due process protections; ensuring compliance with state requirements for staffing, training and certification; specifying methods to be used to document services provided and for submitting reports to the county board; specifying procedures related to authorizing and documenting changes to the ISNA, and for terminating and modifying the same; specifying procedures for dealing with unusual incidents in the course of care; requiring that all parties to the contract accept the contract's terms and conditions; establishing procedures for ensuring the health and welfare of the recipient; establishing procedures for ensuring fiscal accountability and the collection and recording of relevant data; establishing alternative dispute resolution procedures; and specifying the manner in which the service contract will be amended or terminated.
 {¶ 78} R.C. 5126.035(C)(23) allows the GOA to contain, "[a]nything else allowable under federal and state law that the county board and provider agree to."
 {¶ 79} Next, R.C. 5126.035(D) requires that the ISNA be consistent with the GOA and that it include the name of the person who is to receive services thereunder, a "clear and complete description of the services that the recipient is to receive as determined using statewide assessment tools[,]" a copy of the individual's assessment and individualized service plan, and a "clear and complete description of the provider's responsibilities to the recipient and county board * * * in a manner that contributes to and ensures the recipient's health, safety, and welfare."
 {¶ 80} The foregoing provisions governing DSCs are different from those governing the content of Medicaid provider agreements, which can be found at R.C. 5111.22. That the natures and functions of DSCs and provider agreements are distinct and separate from one another is underscored by R.C. 5126.03(E), which provides, "[a] service contract does not negate the requirement that a provider of home and community-based services or medicaid case management services have a medicaid provider agreement with the department of job and family services."
 {¶ 81} The boards argued that their DSCs are valid, lawful and enforceable so long as those contracts comply with the foregoing statutory provisions and do not contain any provisions specifically prohibited by law. Indeed, they pointed out, the very definition of "service contract" is a contract between a provider and a county board of MRDD. R.C. 5126.035(A)(2). The boards also drew the court's attention to the fact that when the General Assembly directed that existing service contracts be amended to conform to the new provisions of the law, it directed the boards and providers to accomplish this; it did not relate this task to ODJFS or ODMRDD, or to the latter agency's promulgation of rules. Thus, the boards maintained, DSCs may exist and be enforceable notwithstanding the fact that such rules had not yet been promulgated, so long as they comport with R.C.5126.035.
 {¶ 82} In seeking summary judgment with respect to Count Five of the complaint, the boards argued that the MSC complies with R.C. 5126.035 and does not result in the various negative consequences listed in Count Five, to wit: interference with individuals' right to freely choose providers, interference with ISNAs, reduction of the number of services that a provider can furnish to an individual with MRDD, violation of the uniform statewide administration of Ohio's Medicaid program, interference with providers' rights under their ODJFS provider agreements, interference with provider licenses and certifications, allowing the boards to withhold payment for services rendered under approved individual service plans, or permitting the boards to unreasonably deny or refuse to negotiate increases in reimbursement amounts.
 {¶ 83} The boards submitted with their motion a copy of the MSC, which they incorporated properly into the record by way of an affidavit. The boards pointed out that the model contract requires that modifications to an ISNA be preceded by consultation with and approval of the affected consumer. They also argued that the model contract does not curtail providers' rights to provide services pursuant to their provider agreements, but only requires providers to comply with state regulations and, as required by R.C. 5126.035(C), sets forth conditions under which the responsible county board may require remedial action or terminate the service contract. The boards argued that Section X of the model contract, which relates to billing and payment for Medicaid services, does not authorize unreasonable withholding of reimbursement or approval of services, but merely requires adherence to applicable administrative rules, including those found in Ohio Adm. Code 5123:2-8-16, 5123:1-2-08 and 5123:1-2-11.
 {¶ 84} The boards also argued that the model contract does not impinge upon the uniform statewide administration of the state's Medicaid program because it complies with, and does not conflict with, the applicable state and federal statutes and is consistent with ODJFS provider agreements.
 {¶ 85} On June 14, 2004, the plaintiffs filed a memorandum in response and opposition to the boards' motion. Therein, they framed the issue as one of a struggle for control over the choice of providers and services that recipients will receive. They cast local MRDD boards and recipients of Medicaid-funded MRDD services as the antipodal parties and seemed to suggest that recipients' interests are well-represented by ODJFS and threatened by the local boards. They argued that the boards were acting unlawfully by promulgating and entering into DSCs, and that the trial court was being required to decide, "whether the State of Ohio or the County Boards of MRDD ultimately control the administration of the Medicaid MRDD services in Ohio."[8] The plaintiffs argued that, in the absence of the not-yet-promulgated regulations governing DSCs, "the County Boards are attempting to usurp the authority of the State and impose their own `model' service contract." (Id. at 2.)
 {¶ 86} The plaintiffs argued that the boards' use of DSCs unlawfully challenges ODJFS' authority and violates R.C. 5111.01, which prohibits other agencies from establishing Medicaid policies that are "inconsistent with a medical policy established, in rule or otherwise, by the director of job and family services." They also argued that the boards' use of DSCs constituted the unlawful substitution of the boards' judgment for that of ODJFS in violation of Section 431.10(e)(1), Title 42, C.F.R. The plaintiffs further contended that R.C. 5126.035(B)(1) prohibits the boards from entering into DSCs until ODJFS and ODMRDD promulgate the required rules. To enter into those contracts in the absence of such rules, the plaintiffs argued, violates the "single state agency" mandate of Section 431.10,42 C.F.R.
 {¶ 87} The plaintiffs further argued that the MSC violates Medicaid recipients' right to exercise a free choice as to who provides their MRDD services. This right is codified at Section 1396a(a)(23), Title 42, U.S. Code, which provides, in relevant part:
[A]ny individual eligible for medical assistance (including drugs) may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required (including an organization which provides such services, or arranges for their availability, on a prepayment basis), who undertakes to provide him such services[.]
However, the plaintiffs' memorandum in opposition to the boards' motion for summary judgment contains no discussion of any specific features of the MSC that result in abridgment or elimination of recipients' freedom of choice of provider.
 {¶ 88} In their reply memorandum filed on June 21, 2004, the boards argued that their act of contracting with a provider does not violate the recipient's right to free choice of a provider. They pointed out that the right to free choice is limited to a choice from among "qualified" providers. Section 1396a(a)(23), Title 42, U.S.C. In order to be a qualified provider, one must, among other things, enter into a DSC. R.C. 5126.035(A)(1); Ohio Adm. Code 5123:2-9-04(C)(5).
 {¶ 89} The boards maintained that a Medicaid provider agreement is simply not sufficient for a provider to be entitled to Medicaid reimbursement for MRDD services rendered because ODJFS' provider agreement does not meet the requirements for a service contract set forth in R.C. 5126.035. The boards pointed out that the plaintiffs admitted this fact in their response to the boards' request for admission number three.[9] It is simply untenable, the boards argued, to say that DSCs are unlawful when the General Assembly has mandated that one of the requirements to become a provider of Medicaid services is the execution of a service contract.
 {¶ 90} On November 16, 2004, the plaintiffs filed a supplemental memorandum in opposition to the boards' motion for summary judgment. In it they added to their original theory of the case and now argued that R.C. 5126.055, the state statute that confers Medicaid local administrative authority upon local boards, conflicts with federal law because it "impermissibly vest[s] administrative discretion in county MR/DD boards that solely belongs to ODJFS, as the single state agency for Medicaid."[10]
 {¶ 91} The plaintiffs argued that, even if the provision for DSCs is not wholly preempted by federal law, federal law still prevents ODJFS from delegating to local boards the discretionary task of defining which provisions will be included in any given DSC. Again, the plaintiffs argued that this would violate the "statewideness" and "single state agency" requirements found in federal Medicaid law.
 {¶ 92} Meanwhile, on June 17, 2004, several days after filing their original response to the boards' motion for summary judgment, the plaintiffs filed their own motion for summary judgment. They began by arguing that the boards' MSC constitutes the unlawful exercise of local boards' discretion, rather than ODJFS' discretion, to impose a statewide uniform contract that all providers must sign in order to be reimbursed for MRDD services rendered to Medicaid-eligible individuals. They argued that the MSC is unlawful both because it had not been promulgated pursuant to valid administrative rules, and because it represented the boards' usurpation of discretion rightfully vested exclusively in ODJFS. The result of this, they maintained, was the unlawful creation of a statewide Medicaid policy without the involvement of the single state agency charged with supervising the administration of the Medicaid program.
 {¶ 93} The plaintiffs argued that R.C. 5126.035 merely requires local boards to enter into service contracts with providers, but it does not authorize them to determine the specific language of each provision of such contracts. This, they said, was left to be determined by ODJFS and ODMRDD through promulgation of rules governing service contracts. They argued that federal law forbids local boards from having the authority to change or disapprove any administrative policy decision of ODJFS, or to otherwise substitute their judgment for that of ODJFS. To the extent that the Medicaid local administrative authority allows local boards to promulgate the MSC, it allows boards to substitute their administrative authority for that of ODJFS, which the plaintiffs contended, violates federal law.
 {¶ 94} The plaintiffs maintained that since ODJFS' provider agreements had been created pursuant to properly made administrative rule, such an agreement may serve as the sole prerequisite for receipt of Medicaid-funded reimbursement in the absence of specific rules governing DSCs. The plaintiffs argued that to allow the continued use of the MSC would jeopardize recipients' right to free choice of providers to the extent that any provider refused to sign the MSC or was terminated by a local board pursuant to the termination provisions therein.
 {¶ 95} ODJFS and ODMRDD finally did promulgate rules governing service contracts, which took effect on July 2, 2004. One of these rules was Ohio Adm. Code 5101:3-41-07, which established "the standards for a service contract between medicaid local administrative authorities (MLAA) and providers of home and community-based services and habilitation center services." This rule was later rescinded and the rescission became effective on July 6, 2005.
 {¶ 96} Ohio Adm. Code 5123:2-9-04 is still in effect. That rule "identifies the duties of the medicaid local administrative authority (MLAA) and serves to outline the requirements for home and community-based waiver administration by a county board that has MLAA in accordance with section 5126.055 of the Revised Code." Ohio Adm. Code 5123:2-9-04(A).
 {¶ 97} The rule requires that a board that has Medicaid local administrative authority perform assessments and evaluations of the individual in accordance with R.C. 5126.055, and this includes the duty to develop a written individual service plan ("ISP") for each individual receiving HCBS. The rule provides that the ISP will "[b]e the fundamental tool by which the MLAA and state will ensure the health, safety, and welfare of individuals served under the waiver." Ohio Adm. Code5123:2-9-04(C)(2)(d). As such, each ISP is subject to the approval of ODMRDD and ODJFS. Ohio Adm. Code 5123:2-9-04(C)(2)(f). As well, it is to be updated annually. Ohio Adm. Code5123:2-9-04(C)(2)(e). The county board must "assist the individual(s) to choose a qualified and willing provider of the services[.]" Ohio Adm. Code 5123:2-9-04(C)(4). A provider is "qualified" to provide HCBS to an individual if the provider is certified by ODMRDD and if the provider is "eligible to enter into or has entered into a service contract with the MLAA * * *." Ohio Adm. Code 5123:2-9-04(C)(5).
 {¶ 98} The rule prescribes a host of other duties of a county board with Medicaid local administrative authority, including the duty to "monitor the services provided to the individual to ensure the individual's health, safety, and welfare", "take necessary action * * * to ensure the health, safety, and welfare of individuals served", conduct investigations using an investigative agent, and cooperate with program and fiscal audits. Ohio Adm. Code 5123:2-9-04(C).
 {¶ 99} As a result of this change in status quo occasioned by the promulgation of the new rules, the trial court ordered supplemental briefing on certain issues raised in the parties' motions for summary judgment. Accordingly, on September 16, 2004, the plaintiffs filed a second, revised summary judgment motion.
 {¶ 100} Though Ohio Adm. Code 5123:2-9-04 sets forth the duties of local boards with respect to the administration of HCBS, and R.C. 5126.05(C) allows boards to enter into contracts with providers "upon such terms as may be agreeable," the plaintiffs argued once again that no provision of Ohio law vests county boards with the authority to define the terms of service contracts. The plaintiffs' revised motion contained the refrain that the defendant boards' MSC is unlawful and unenforceable. This time they argued that the MSC is unlawful because the Centers for Medicare and Medicaid Services ("CMS"), the federal agency responsible for monitoring Ohio's compliance with federal Medicaid law, has determined that the statutory requirements for service contracts violate federal law and that providers cannot be required to enter into such a contract prior to receiving Medicaid reimbursement for their services.
 {¶ 101} In support of this contention the plaintiffs attached to their revised motion for summary judgment the affidavit of Suzanne J. Scrutton, who identifies herself therein as an attorney for the plaintiffs. She attaches to her affidavit 23 pages of materials that she says she received from the director of ODMRDD at an August 24, 2004 "stakeholders meeting." The materials purport to be ODMRDD-prepared summaries of CMS' "position," and "comments" and "concerns" regarding various aspects of then-effective rules governing habilitation center services provided pursuant to a federal waiver. The materials also purport to contain ODMRDD's "response" to CMS' positions, comments and concerns. In their revised motion the plaintiffs argue that the documents attached to Attorney Scrutton's affidavit establish that CMS "has concluded (i) that the requirements for a county board service contract violate federal law, and (ii) that providers cannot be required to have a contract with county boards prior to billing Medicaid and receiving payment for their services." (Plaintiffs' September 16, 2004 Motion for Summary Judgment, at 3.)
 {¶ 102} In their memorandum in opposition to the plaintiffs' revised motion for summary judgment, the boards argued that Attorney Scrutton's affidavit is insufficient to render the materials attached thereto appropriate evidence to be considered in determining whether to grant plaintiffs' summary judgment. They argued that her statement that the materials were passed out to her at a meeting does not lay a proper foundation for admission of the documents, nor does it authenticate them. The boards also argued that even if the documents were considered, they would not constitute admissible evidence because they purport to be an agency's opinion as to an ultimate legal issue, one that can only be decided by the courts, not the agency.
 {¶ 103} Civ.R. 56(C) places strict limitations upon the type of documentary evidence that a party may use in support of or in opposition to summary judgment. Documents that do not fall within one of the categories of evidence listed in Civ.R. 56(C) may be introduced as proper evidentiary material only when incorporated by reference into a properly framed affidavit pursuant to Civ.R. 56(E). Biskupich v. Westbay Manor Nursing Home (1985),33 Ohio App.3d 220, 222, 515 N.E.2d 632. "Documents which are not sworn, certified, or authenticated by way of affidavit have no evidentiary value and shall not be considered by the trial court." State ex rel. Shumway v. Ohio State Teachers RetirementBd. (1996), 114 Ohio App.3d 280, 287, 683 N.E.2d 70, quotingMitchell v. Ross (1984), 14 Ohio App.3d 75, 14 OBR 87,470 N.E.2d 245.
 {¶ 104} "[D]ocuments must be authenticated or identified as a condition precedent to their admissibility." St. Paul Fire Marine Ins. Co. v. Ohio Fast Freight, Inc. (1982),8 Ohio App.3d 155, 157, 8 OBR 213, 456 N.E.2d 551. "Generally, authentication or identification is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Id. at paragraph three of the syllabus; Evid.R. 901(A). "The common manner of identifying a document is through testimony of a witness with knowledge." St. Paul Fire Marine, supra, at paragraph four of the syllabus.
 {¶ 105} Moreover, Civ.R. 56(E) clearly provides that "supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated in the affidavit." If the affiants lacks personal knowledge of the records attached to his or her affidavit, the affiant has not properly authenticated the records. Burton v. Triplett (Feb. 14, 2002), 10th Dist. No. 01AP-357. "`Personal knowledge' is defined as: `knowledge of the truth in regard to a particular fact or allegation, which is original, and does not depend on information or hearsay.'"Brannon v. Rinzler (1991), 77 Ohio App.3d 749, 756,603 N.E.2d 1049,[11] quoting Black's Law Dictionary (6 Ed. 1990) 873; see, also, State ex rel. Shumway v. Ohio State TeachersRetirement Bd. (1996), 114 Ohio App.3d 280, 288, 683 N.E.2d 70.
 {¶ 106} In this case, Attorney Scrutton avers in her affidavit that the exhibits attached thereto were handed to her during a meeting. This does not establish that she has first-hand, personal knowledge that the documents are authentic; that is, that they are in fact what they purport to be. No other authentication was attempted. Furthermore, the documents are not self-authenticating under Evid.R. 902. Consequently, they are not proper evidentiary material to be considered in passing upon a motion for summary judgment.
 {¶ 107} We do not hold that CMS can never opine that a state's plan or practice violates one or more aspects of federal law, but the evidence of record in the present case does not demonstrate that CMS has done so with respect to Ohio. We must decide whether Ohio's statutory and regulatory provision for county boards' use of service contracts, and the boards' MSC, actually conflict with any aspect of federal law, and we must do so on the record before us. This is the issue that comprised the remainder of the plaintiffs' revised motion for summary judgment and of the boards' memorandum in opposition thereto.
 {¶ 108} The plaintiffs directed the court's attention to the MSC, attached to their supplemental motion for summary judgment as Exhibit "D." They argued that several of its provisions create a "de facto statewide policy" for Medicaid that has not been determined by ODJFS, thereby violating the "single state agency" requirement in Section 1396a, Title 42 U.S.Code. One such provision is found on page seven of the MSC, and forms a part of Section VII thereof, which is entitled, "Remedial Actions Related to Unusual or Major Unusual Incidents Adversely Affecting the Health, Safety, and Welfare of Individuals." The pertinent term provides, in part:
C. The Board and Provider agree to the following actions to ensure health, safety, and welfare of individuals served pursuant to this Contract:
* * *
2. Code Two: If the ODMRDD or the ODJFS issues a citation to the Board under OAC (sic) § 5126.055(G)(1) which cites the Board for deficient implementation of its Local Medicaid Administrative Authority or for any other related deficiency or violation, and if the deficiency or violation affects the health, safety, or welfare of an individual, and if the deficiency or violation exists in part or in full as a result of actions or inactions of the Provider under this Contract, the Provider shall correct the portion of the deficiency or violation which was caused by the Provider within 24 hours. If the Provider fails to correct the deficiency or violation, the Provider shall cease providing the Medicaid Waiver Services that pertain to such deficiency or violation, and the individual shall select another provider according to the requirements set forth ORC § 5126.33.
 {¶ 109} The plaintiffs argued that the foregoing provision "effectively" gives the local board the authority to "terminate an allegedly deficient provider's ODJFS provider agreement and ODMRDD license or certificate."[12] But this is an incorrect characterization. First, under this term of the contract, the provider is given an opportunity to cure the deficiency before any adverse action is taken. Second, the provision very explicitly applies only to services rendered to the particular recipient subject of the contract; the remedial measures contained therein thus apply only to that contract, not to the provider's contracts that pertain to other individuals eligible to receive Medicaid-funded MRDD services, and not to the provider's certification by ODMRDD or its provider agreement with ODJFS.
 {¶ 110} Next, the plaintiffs argued that the MSC contains none of the due process protections of R.C. Chapter 119, to which ODJFS and ODMRDD are subject when taking action against providers' licenses or certificates. They argued that this, too, represents an unlawful usurpation of ODJFS' and ODMRDD's authority. But this argument goes to the basic fairness of Ohio's Medicaid statutory scheme, not whether the provisions of the contract impermissibly conflict with state or federal law, or with the expressed policies of ODJFS as the single state agency responsible for the supervision of the administration of Ohio's Medicaid program.
 {¶ 111} Finally, the plaintiffs argued that any provision within the MSC that allows boards to terminate contracts violates the right of recipients to free choice of providers, codified at Section1396a(a)(23), Title 42 U.S.Code.
 {¶ 112} On November 16, 2004, the plaintiffs filed another supplemental motion for summary judgment arguing that both DSCs and ISPs developed for each recipient of HCBS are unlawful means of county boards exerting discretionary control over providers and recipients because they violate the statewideness requirement and the single state agency requirement. The plaintiffs argued that they are entitled to a declaration that all DSCs and ISPs are unlawful and void. For support of this contention, the plaintiffs attached another affidavit of Maureen Corcoran, who attempted to incorporate within her affidavit certain attached exhibits that, she stated, she "received * * * from the State of Ohio in the course and scope of my duties as [OPRA's] President for Governmental Affairs." The exhibits to her affidavit are the same documents that the plaintiffs attempted to make a part of the record through Attorney Scrutton's affidavit, along with several other documents which purport to be part of correspondence between ODJFS and CMS regarding ISPs, or, as CMS refers to them, "plans of care."
 {¶ 113} However, the documents attached to Ms. Corcoran's affidavit suffer from the same evidentiary infirmity under Civ.R. 56 that rendered improper the documents attached to Attorney Scrutton's affidavit. Having "received" documents from the State of Ohio in the course of one's employment does not properly authenticate those documents. For this reason, and those previously explained, infra, at ¶¶ 103-106, the documents attached to Ms. Corcoran's affidavit were not properly before the court on summary judgment.
 {¶ 114} On November 30, 2004, ODJFS and ODMRDD filed a reply to the plaintiffs' November 16, 2004 supplemental motion for summary judgment. The state defendants briefly pointed out that an ISP is not a service contract; rather, it serves as the plan of care required to be developed by county boards as a prerequisite for the provision of HCBS. The state defendants also pointed out that issues surrounding the use of ISPs was being separately litigated in the Franklin County Court of Common Pleas in a case entitled Zimmerman v. ODJFS, which the trial court had refused to consolidate with the present case.
 {¶ 115} On December 6, 2004, the boards filed a memorandum in opposition to the plaintiffs' motions for summary judgment. They began by arguing, as they in support of their own motion for summary judgment, that providers have no standing to challenge provisions of Ohio law or the practices of state government on the basis that any of them violates the statewideness or free-choice-of-provider requirements. The boards pointed out that these principles are intended to benefit recipients of services, not providers. Therefore, they contended, providers lack standing to enforce these rights. The boards also noted that Congress had not even given consumers a private right of action to enforce the single state agency provision. Finally, they argued that county boards' local oversight authority is not preempted by federal law.
 {¶ 116} Review of the trial court's judgment entry reveals the following. The court found Count One of the plaintiffs' complaint to be moot, given that the rules had been promulgated during the pendency of the lawsuit. However, the trial court granted summary judgment in favor of the plaintiffs and against the boards as to Counts Three and Five, and denied the boards' motion for summary judgment. The court's April 14, 2005 judgment entry provides, in relevant part:
5. On the issue of service contracts, summary judgment is granted to Plaintiffs against Defendant Boards, and it is hereby declared that: (a) the Defendant Boards may only enter into, renew, and/or enforce service contracts that do not conflict with, add requirements to, or otherwise violate federal or state law; (b) the Defendant Boards may not require providers to enter into service contracts, enforce existing service contracts, or new existing service contracts, that conflict with, add requirements to, or otherwise violate federal or state law; (c) in lieu of a lawful service contract, an ODJFS Medicaid Provider Agreement is the only agreement that is necessary for a Medicaid provider to obtain Medicaid payment for services to an eligible Medicaid recipient; and (d) only services set forth in a plan of care (i.e. individual service plan) are reimbursable under a Medicaid home and community based waiver.
6. Further, Defendant Boards are permanently enjoined as follows: (a) Defendant Boards shall not enter into, renew, and/or enforce service contracts that conflict with, add requirements to, or otherwise violate federal or state law; (b)
Defendant Boards shall not require providers to enter into service contracts that conflict with, add requirements to, or otherwise violate federal or state law; and (c) Defendant Boards shall, in lieu of lawful service contracts, recognize, acknowledge, and give force and effect to ODJFS Medicaid Provider Agreements.
(April 14, 2005 Judgment Entry, at 2.)
 {¶ 117} As the boards correctly noted in their brief, although the trial court ostensibly granted summary judgment in favor of the plaintiffs, its language with respect to service contracts merely states that county boards cannot do what is unlawful and can do anything that does not violate or conflict with federal or state law. But this does not definitively and unequivocally resolve the parties' dispute regarding whether service contracts are, ipso facto, unlawful and preempted. The court also declared that, unless a "lawful" service contract is in place, providers may obtain Medicaid-funded reimbursement for HCBS and state-plan services that they render to eligible recipients. On appeal, the parties differ as to both issues.
 {¶ 118} The arguments of the parties address two issues, to wit: (1) whether Ohio's statutory provisions relating to local boards entering into DSCs violate, and are wholly preempted by, the statewideness, free choice and "single state agency" provisions of federal Medicaid law; and (2) whether a provider agreement may serve, as the trial court's judgment stated, "in lieu of a lawful service contract."
 {¶ 119} We begin by examining whether federal law preempts Ohio's statutes related to DSCs. The Supremacy Clause of the United States Constitution provides that "the Laws of the United States * * * shall be the supreme Law of the Land; * * * any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Clause 2, Article VI, United States Constitution. Pursuant to the Supremacy Clause, Congress possesses the power to preempt state law. Jenkins v. James B.Day Co. (1994), 69 Ohio St.3d 541, 544, 634 N.E.2d 998, citingIn re Miamisburg Train Derailment Litigation (1994),68 Ohio St.3d 255, 259, 626 N.E.2d 85. In addition, "a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation." Miamisburg TrainDerailment, supra, at 260, quoting Louisiana Pub. Serv. Comm.v. Fed. Communications Comm. (1986), 476 U.S. 355, 369,106 S.Ct. 1890, 90 L.Ed.2d 369.
 {¶ 120} "Federal preemption of state law can occur in essentially three instances: (1) where Congress expressly preempts state law (express preemption); (2) where Congress has occupied the entire field (field preemption); or (3) where there is an actual conflict between federal and state law (conflict preemption). Field and conflict preemption are both forms of implied preemption." Minton v. Honda of America Mfg., Inc.
(1997), 80 Ohio St.3d 62, 69, 684 N.E.2d 648. The plaintiffs in the present case argue that Ohio's statutes related to DSCs and local board oversight are preempted because there is an actual conflict between federal and state law.
 {¶ 121} "In the absence of explicit statutory language preempting state law, preemption should be strictly construed in favor of finding against preemption." Carter v. ConsolidatedRail Corp. (1998), 126 Ohio App.3d 177, 182, 709 N.E.2d 1235. "The critical question in any preemption analysis is whether Congress intended state law to be superseded by federal law.Minton at 69. Thus, "[i]n any case concerning preemption, congressional purpose must be the ultimate focus." J.A. CrosonCo. v. J.A. Guy, Inc. (1998), 81 Ohio St.3d 346, 350,691 N.E.2d 655, citing Malone v. White Motor Corp. (1978), 435 U.S. 497,504, 98 S.Ct. 1185, 55 L.Ed.2d 443.
 {¶ 122} Conflict pre-emption arises when `compliance with both federal and state regulations is a physical impossibility,' or when a state law `stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"Wisconsin Public Intervenor, supra, at 605. (Citations omitted.) However, the preemption of state law by federal statute or regulation is not favored "in the absence of persuasive reasons — either that the nature of the regulated subject matter permits no other conclusions, or that the Congress has unmistakably so ordained." Florida Lime Avocado Growers, Inc.v. Paul (1963), 373 U.S. 132, 142, 83 S.Ct. 1210,10 L.Ed.2d 248.
 {¶ 123} The plaintiffs herein maintain that service contracts and local boards' oversight authority inherent therein conflict with the "single state agency," statewideness and free choice provisions of federal Medicaid law. We will examine each in turn.
 {¶ 124} Pursuant to Section 1396a(a)(5), Title 42, U.S. Code, a state plan must "provide for the establishment or designation of a single State agency to administer or to supervise the administration of the plan. * * *" (Emphasis added.) The single state agency requirement originally appeared in the Social Security Act of 1935 with reference to the Title I Old-Age Assistance Program.[13] The single state agency language was incorporated into Title XIX when the Medicaid program was enacted in 1965.[14]
 {¶ 125} In Rolland v. Cellucci (D.Mass. 1999),52 F.Supp.2d 231, 243, the district court held:
The single state agency mandate arose out of Congress' desire to minimize the improper denial of benefits and to ensure a certain level of services and quality of care. The mandate accomplishes these goals by limiting the authority to make administrative decisions to a single state agency. * * * The "single state agency" requirement derives from a desire to focus accountability for plan operation. (Citations omitted.)
 {¶ 126} In Sobky v. Smoley (E.D.Cal. 1994),855 F.Supp. 1123, 1145, the court wrote, "[t]he legislative history of the 1965 Medicaid Act's single state agency requirement —42 U.S.C. § 1396a(a)(5) — maintains this concentration on administrative efficiency." In Fulkerson v. Commr., Maine Dept. of HumanServices (D.Me. 1992), 802 F.Supp. 529, the district court held, "[i]t appears that the reason for this requirement was to assure `that the States will not administer the provisions for services in a way which adversely affects the availability or the quality of the care to be provided' and `to avoid a lack of accountability for the appropriate operation of the program.'" Id. at 538, quoting Hillburn v. Maher (C.A.6, 1986),795 F.2d 252, 261, certiorari denied, Heintz v. Hillburn (1987),479 U.S. 1046, 107 S.Ct. 910, 93 L.Ed.2d 859.
 {¶ 127} The regulation implementing the single state agency requirement is found at Section 431.10, Title 42, C.F.R., which states in pertinent part:
(b) Designation and certification. A State plan must —
(1) Specify a single State agency established or designated to administer or supervise the administration of the plan;
* * *
(d) Agreement with Federal or State agencies. The plan must provide for written agreements between the Medicaid agency and the Federal or other State agencies that determine eligibility for Medicaid, stating the relationships and respective responsibilities of the agencies.
(e) Authority of the single State agency. In order for an agency to qualify as the Medicaid agency —
(1) The agency must not delegate, to other than its own officials, authority to —
(i) Exercise administrative discretion in the administrationor supervision of the plan, or
(ii) Issue policies, rules, and regulations on program matters.
* * *
(3) If other State or local agencies or offices perform services for the Medicaid agency, they must not have the authority to change or disapprove any administrative decision of that agency, or otherwise substitute their judgment for that of the Medicaid agency with respect to the application of policies, rules, and regulations issued by the Medicaid agency.
(Emphasis added.)
 {¶ 128} This regulation was first published in the Federal Register in 1971.[15] It was originally promulgated, however, in a supplement to a federal handbook issued upon enactment of the Medicaid Act — the United States Department of Health, Education, and Welfare, Welfare Administration, Bureau of Family Services, Handbook of Public Assistance Administration ("Handbook"), Supplement D — Medical Assistance Programs Under Title XIX of the Social Security Act, D-2130 (June 17, 1966) ("Supplement D").
 {¶ 129} The purpose of the Handbook was described as follows:
The Handbook of Public Assistance Administration is issued by the Bureau of Family Services and is the official medium for issuance of interpretations and instructions concerning requirements of the public assistance titles of the Social Security Act and recommendations for the administration of State public assistance programs. The Handbook is prepared for use by State agencies and staff of the Federal agency in carrying out their responsibilities for administering the public assistance programs in accordance with the Federal Act.
(Handbook, supra, Introduction (June 12, 1963).)
 {¶ 130} Supplement D stated in part:
2. In relationships with other departments of State government, the single State agency interprets its role in such a way that it does not delegate to other than its own officials its requisiteultimate authority for exercising administrative judgment in theState-wide administration or supervision of the plan. 3. In the event that any rules and regulations or decisions of the single State agency are subject to review, clearance, or other action by other offices or agencies of the State government, the requisite authority of the single State agency is not impaired.
4. In the event that any services are performed for the single State agency by other State or local agencies or offices, such other agencies or offices are not authorized to, and do not, change, disapprove, or delay action on any administrative decision of the single State agency, or otherwise substitute their judgment for that of the agency as to the application of policies, rules, and regulations promulgated by the State agency. Any agreements with other public agencies or private organizations to act as the single State agency's agent include provisions for the single State agency obtaining from the agent the data needed for program planning, evaluation, reporting, and accounting purposes and do not in any way impair the ultimateauthority of the single State agency.
(Handbook, supra, Supp. D, D-2130.) (First emphasis added.)
 {¶ 131} The foregoing Supplement D provisions were transferred to the Code of Federal Regulations in 1971.[16]
The 1971 regulation stated in pertinent part:
(c) Conditions for implementing the requirements of paragraph (a) [state plan requirements] of this section.
(1) The State agency will not delegate to other than its own officials its authority for exercising administrative discretion in the administration or supervision of the plan, including the issuance of policies, rules, and regulations on program matters.
(2) In the event that any rules and regulations or decisions of the single State agency are subject to review, clearance, or other action by other offices or agencies of the State government, the requisite authority of the single State agency will not be impaired.
(3) In the event that any services are performed for the single State agency by other State or local agencies or offices, such agencies and offices must not have authority to review, change, or disapprove any administrative decision of the single State agency, or otherwise substitute their judgment for that of the agency as to the application of policies, rules, and regulations promulgated by the State agency. (36 Fed.Reg. 3861-3862 (Feb. 27, 1971).)
 {¶ 132} The current regulation, quoted infra, at ¶ 127, mirrors the language of both Supplement D and the 1971 regulation without substantive change. In addition to the above-quoted language ultimately transferred to the Code of Federal Regulations, Supplement D contained a lengthy discussion of the single state agency requirement. Handbooks issued by federal agencies "generally are considered to be non-binding instructions or internal operating procedures." Rousseau v. City ofPhiladelphia (1984), 589 F.Supp. 961, 971. The Handbook is, however, "`entitled to notice so far as it is an official interpretation of statutes or regulations with which it is not in conflict.'" Burroughs v. Hills (1984), 741 F.2d 1525, 1529, quoting Litton Systems, Inc. v. Whirlpool Corp. (C.A.D.C., 1984), 728 F.2d 1423, 1439. Indeed, the United States Supreme Court has frequently cited to the Handbook as a source of federal agency interpretation of the Medicaid Act and other Social Security Act public assistance programs.[17]
 {¶ 133} In Supplement D, the federal agency interpreted the single state agency requirement as follows:
The requirement for a single State agency means that one State agency is designated by the State as the `single State agency' and is authorized to maintain in operation for the State an approved State plan. The State has a choice of administering theplan through the State agency directly or through its politicalsubdivisions under State agency supervision. Once the single State agency is established or designated it is the agency of the State government that represents the State in its dealings withthe Federal agency on all aspects of the medical assistance plan and its operation. It is the agency of the State government responsible for: obtaining the statutory authority necessary to submit a plan meeting all Federal requirements; preparing the State plan and establishing policies for the operation of the program; assuring that it can carry out the plan in all political subdivisions; obtaining the State funds or the State-local funds (as the case may be); meeting all audit requirements; and beingaccountable to the [Federal agency] for the proper andefficient administration of the program.
The provision for a `single State agency' is not designed to set aside the relationships with the Governor and other officers of the State or with other departments of the State government that are normal and proper within the State. The agency designated as the `single State agency' is still subject to the ordinary legislative processes, executive supervision, and budget and audit procedures in the State. Other agencies and offices ofState government, such as the State fiscal officer and the Statecivil service agency, may perform services for the single Stateagency that are essential to the operation of the plan. Anotheragency or authority of government in the State, however, may notbe authorized in the plan, or permitted in practice, tosubstitute its judgment for that of the `single State agency' inadministrative decisions involving the application of thepolicies, rules, and regulations promulgated by the Stateagency. Similarly, if local agencies administer the plan, the`single State agency' must see that the authority of suchagencies to make administrative decisions under the medicalassistance law is not impaired by the action of other agencies orofficials of State or local governments.
* * *
The `single State agency' is responsible for any services that are performed by other agencies in the program under the plan. This does not mean that the State agency takes over or directs such services. The agency, however, must take such steps as may be necessary in the State to assure that the services, as performed in the medical assistance program, meet the Federal requirements.
(Handbook, supra, Supp. D.) (Emphases added.)
 {¶ 134} In this vein, Section 435.903, Title 42, C.F.R., provides that the single state agency must:
(a) Have methods to keep itself currently informed of the adherence of local agencies to the State plan provisions and the agency's procedures for determining eligibility; and
(b) Take corrective action to ensure their adherence.
 {¶ 135} Upon review of the applicable federal statutes and regulations, it is clear that political subdivisions of the state, such as county boards of MRDD in Ohio, are permitted to administer certain components of the Medicaid program, and their administrative efforts will be supervised exclusively by ODJFS, which is the agency solely accountable for Ohio's Medicaid plan. The single state agency does not have to administer the program — states have a choice whether they wish to have the designated agency administer the program or supervise the administration of the program. In either case, the single state agency will bear the ultimate responsibility for the state's compliance with federal law. However, it can bear this responsibility by supervising a system of local offices that perform day-to-day administration of the program, so long as those local offices do not usurp the single state agency's role as the policy-setting authority. So long as the local offices adhere to state plan requirements, administration through a system of local offices does not violate federal law. Thus, in order to prevail on this point, the plaintiffs must show that the MSC results in specific, tangible violations of the mandate that ODJFS, as Ohio's designated agency, retain ultimate authority for the state's Medicaid plan.
 {¶ 136} The record does not reveal, and the plaintiffs have failed to demonstrate, that the boards' promulgation of the MSC, and entrance into individual DSCs respecting each recipient of services, violates the single state agency mandate. We perceive nothing in the MSC or in Ohio statutory law that conflicts with federal law, and we perceive no conflict between the MSC and the provisions of the Ohio Revised Code respecting service contracts. The plaintiffs have failed to meet their burden of demonstrating that the use of service contracts, along with the fact that a local board is the second party to each, violates the single state agency provision. The plaintiffs have also failed to demonstrate that use of the MSC constitutes, or has led to, ODJFS having failed to keep itself currently informed of the boards' adherence to state plan policies and procedures.
 {¶ 137} Pursuant to Section 1396a(a)(1), Title 42, U.S. Code, a state Medicaid plan must, "provide that it shall be in effect in all political subdivisions of the State, and, if administered by them, be mandatory upon them[.]" The implementing regulation for this "statewideness" requirement is found at Section 431.50, Title 42, C.F.R., which provides:
A State plan must provide that the following requirements are met:
(1) The plan will be in operation statewide through a system of local offices, under equitable standards for assistance and administration that are mandatory throughout the State.
(2) If administered by political subdivisions of the State, the plan will be mandatory on those subdivisions.
(3) The agency will ensure that the plan is continuously in operation in all local offices or agencies through —
(i) Methods for informing staff of State policies, standards, procedures, and instructions;
(ii) Systematic planned examination and evaluation of operations in local offices by regularly assigned State staff who make regular visits; and
(iii) Reports, controls, or other methods.
 {¶ 138} The essence of the statute and the regulation interpreting it is that the state plan must provide for the plan to operate in all political subdivisions of the state, which means that the plan must offer payment in every political subdivision for every service for which the plan generally offers payment. See, e.g., Sobky v. Smoley (E.D.Cal. 1994),855 F. Supp. 1123. The court in Bruggeman v. Blagojevich (C.A.7, 2003), 324 F.3d 906, 911, stated that the statewideness requirement "requires merely that the state not exclude any of its political subdivisions from the state's Medicaid plan." Accord, Equal Access for El Paso, Inc. v. Hawkins (W.D.TX 2006), 428 F.Supp.2d 585, 620 ("[T]he Statewideness Provision has an aggregate focus on the administration of a state plan, requiring it to be in effect in and mandatory upon all political subdivisions in a state.")
 {¶ 139} The statewideness provision is concerned with uniform operation of the plan and equal access to it for all residents of the state. There is no evidence in the record demonstrating that either service contracts in general, or the MSC in particular, violate this provision.
 {¶ 140} We reject the plaintiffs' argument that service contracts "ultimately define the Medicaid services available from a Medicaid provider, without regard to the services available in other political subdivisions of the State."[18] Each service contract identifies the services that the particular recipient "is to receive as determined using statewide
assessment tools[.]" R.C. 5126.035(D)(2). (Emphasis added.) It does not limit services that the recipient may receive in a way that offends the statewideness requirement; rather, the only "limit" placed upon the services to be provided under any given service contract is the use of "statewide assessment tools" in place for developing ISNA (in the case of state-plan services) or ISPs (in the case of HCBS). The remaining requirements for service contracts, found in R.C. 5126.035, are directed toward ensuring quality, cost-effective care that is continuously responsive to recipients' current needs and that comports in all respects with the state plan or approved waiver. We perceive no conflict between the provisions for service contracts and the federal statewideness requirement.
 {¶ 141} Pursuant to Section 1396a(a)(23), Title 42, U.S. Code, each state Medicaid plan must "* * * provide that (A) any individual eligible for medical assistance (including drugs) may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required * * * who undertakes to provide him such services * * * [.] The implementing regulation for the so-called "free choice of provider" provision is found at Section 431.51, Title 42, C.F.R., which provides, in pertinent part:
(a) * * *
(1) Section 1902(a)(23) of the Act provides that recipients may obtain services from any qualified Medicaid provider that undertakes to provide the services to them.
* * *
(b) State plan requirements. A State plan, except the plan for Puerto Rico, the Virgin Islands, or Guam, must provide as follows:
(1) Except as provided under paragraph (c) of this section and part 438 of this chapter, a recipient may obtain Medicaid services from any institution, agency, pharmacy, person, or organization that is —
(i) Qualified to furnish the services; and
(ii) Willing to furnish them to that particular recipient.
 {¶ 142} The sole basis upon which the plaintiffs argue that Ohio's service contract requirement conflicts with the federal free choice of provider provision is that service contracts, the plaintiffs argue, impermissibly limit recipients' choice of provider by restricting the pool of providers available to any given recipient.
 {¶ 143} But, "the Medicaid statutes simply allow providers to decide whether to participate in the Medicaid program in the first place. They are free not to do so. If they do participate, however, they are bound by certain obligations, including compliance with federal, state and local laws. In addition, the federal Medicaid statutes mandate that each state Medicaid plan contain certain provisions regulating providers' activities in various respects." Catanzano v. Wing (W.D.NY, 1998),992 F.Supp. 593, 596. (Citations omitted.) "The `free choice of provider' requirement is designed to assure each Medicaid recipient a free choice among qualified providers of medical assistance and to guarantee that the state will not dictate to any Medicaid recipient where he or she must receive treatment. `This provision does not obligate the State to pay the charges of the provider without reference to its schedule of charges or itsstandard of care.'" Briarcliff Haven, Inc. v. Dept. of HumanResources (N.D. Ga., 1975), 403 F.Supp. 1355, 1362, quoting 1967 U.S. Code Cong. Adm. News 3021. (Emphasis added.)
 {¶ 144} In other words, the requirement that a provider take various actions, including entering into a service contract with respect to each individual who has chosen that provider, in order to be considered a "qualified" provider, does not mean that Ohio has unlawfully omitted to respect the free choice of provider mandate. As the United States Supreme Court noted, the free choice provision, "* * * gives recipients the right to choose among a range of qualified providers, without government interference." O'Bannon v. Town Court Nursing Center (1980),447 U.S. 773, 785, 100 S.Ct. 2467, 65 L.Ed.2d 506. "The extent of [a recipient's right to free choice of provider] is not absolute * * * and does not include a right to receive services from a provider who is not qualified." Martin v. Taft (S.D. Ohio, 2002), 222 F.Supp.2d 940, 979.
 {¶ 145} Thus, the free choice of provider provision is not violated by statewide requirements directed at using medical assistance funds to reimburse only those services rendered by qualified providers. Nothing in federal Medicaid law prohibits states from implementing state laws and rules that set limits and define the contours of what constitutes a "qualified provider" in order to meet the federally-imposed requirements that the states ensure quality of care and fiscal efficiency. In Ohio, one of the statutorily imposed requirements is that providers chosen by recipients must enter into a service contract with the local board, which sets forth, inter alia, the precise responsibilities that the provider owes to each recipient. R.C. 5126.035; Ohio Adm. Code 5123:2-9-04(C)(5). Our review of this statutory and regulatory law, and of the MSC itself, reveals no arbitrary or unlawful provision with which providers must comply in order to be deemed qualified.
 {¶ 146} Having reviewed the arguments of the parties, along with all of the pleadings and evidence of record, we hold that the plaintiffs have not met their burden to demonstrate that there is a genuine issue of fact with respect to whether service contracts in general, and the MSC in particular, violate federal law. Moreover, the boards did meet their burden to demonstrate that they are entitled to judgment as a matter of law.
 {¶ 147} It is clear that federal law allows states to decide whether the single state Medicaid agency will administer, or will supervise the administration of, its Medicaid plan. Federal law explicitly contemplates the use of local political subdivisions of the state to administer the program. Moreover, the plaintiffs have not demonstrated how any specific provision contained in the MSC, or required to be contained in direct service contracts, violates or is inconsistent with any ODJFS policy or judgment.
 {¶ 148} Furthermore, it is clear that state law provides for ODJFS oversight and accountability for the actions undertaken by county boards in the performance of their duty to administer aspects of Ohio's plan. See, e.g., R.C. 5126.054, 5126.146,5126.04, 5126.055, and R.C. 5126.035; Ohio Adm. Code5123:2-9-04(C). There is no evidence of record that ODJFS does not "[h]ave methods to keep itself currently informed of the adherence of local agencies to the State plan" or that it does not "[t]ake corrective action to ensure their adherence." Section 435.903, Title 42, C.F.R. The purpose of the single state agency requirement is accountability for the state's compliance with federal requirements; there is no evidence that this accountability has been impaired by administrative or policy decisions made by local boards.
 {¶ 149} There is also no evidence of record that the state's plan is not in effect in all political subdivisions in the state, or that the ISNA and ISPs required to be contained within service contracts are not developed using statewide assessment tools and other mechanisms to implement statewide policies. Finally, the role of the boards does not impinge upon recipients' freedom to receive services from the qualified provider of their choice. On the record before us, we hold that service contracts between local boards and providers are not, ipso facto, unlawful, and the MSC does not violate or conflict with federal Medicaid law.
 {¶ 150} As to the second issue on appeal, we hold that provider agreements do not constitute acceptable alternatives to, or replacements for, service contracts. The requirements for provider agreements are set forth in R.C. 5111.22. Review of this statute reveals that provider agreements in no wise meet the requirements for service contracts, which are set forth in R.C.5126.035. Moreover, so long as a service contract meets the statutory and regulatory requirements therefor, it is "lawful" and need not be substituted with any other document.
 {¶ 151} For all of the foregoing reasons, the boards are entitled to judgment as a matter of law, and the plaintiffs' motion for summary judgment should be denied. Accordingly, the boards' first and second assignments of error are sustained.
 {¶ 152} In summary, we dismiss ODJFS' appeal for lack of standing, we overrule the plaintiffs' cross-assignment of error, we sustain the boards' first and second assignments of error, and we sustain in part and overrule in part the boards' third assignment of error. The judgment of the Franklin County Court of Common Pleas is hereby reversed, and this cause is remanded to that court for further proceedings not inconsistent with this opinion.
Judgment reversed; cause remanded.
Brown, and Travis, J., concur.
[1] 79 Stat. 286 (1965), 42 U.S.C. 1396n, as amended.
[2] The Ohio Association of County Boards of Mental Retardation and Developmental Disabilities and an organization known as the Ohio Superintendents of County Boards of MRDD, were also named as defendants but were later dismissed. As such, they are not parties to this appeal.
[3] Reconsideration denied by, modified by Snyder v. Snyder,2005-Ohio-567.
[4] The plaintiffs also filed a "Notice of Cross-Appeal" on May 18, 2005. They, too, sought reversal of the April 14, 2005 judgment entry, but agreed with some of its contents, including the trial court's finding that the plaintiffs had standing to pursue their claims.
[5] See R.C. 5126.054 and 5126.146.
[6] H.B. 66, effective July 1, 2005, deleted the first sentence of R.C. 5126.035(E), which read, "The director of mental retardation and developmental disabilities shall adopt rules in accordance with Chapter 119 of the Revised Code governing service contracts." The amendment also deleted the requirement that DSCs comply with rules adopted under former division (E).
[7] The reader will recall that this refers to Individual Service Needs Addenda.
[8] June 14, 2004 Memorandum in Response to Boards' Motion for Judgment on the Pleadings and for Summary Judgment, at 1.
[9] The boards' memorandum indicates that copies of the plaintiffs' responses to requests for admission were attached thereto, but no documents are in fact attached to this pleading. Our review of the record reveals that these discovery responses were never filed in the trial court.
[10] December 6, 2004 Plaintiffs' Supplemental Memorandum in Response and Opposition to the Summary Judgment Motion of Defendant County Boards, at 3.
[11] Jurisdictional motion overruled (1992),63 Ohio St.3d 1441.
[12] Plaintiffs' Sept. 16, 2004 Supplemental Motion for Summary Judgment, at 15.
[13] Social Security Act of Aug. 14, 1935, ch. 531, § 2,49 Stat. 620.
[14] Pub.L. No. 89-97, 1965 U.S. Code Cong. Admin. News, at pp. 305, 371; Sobky v. Smoley (E.D.Cal. 1994),855 F.Supp. 1123, 1145.
[15] 36 Fed.Reg. 3861-3862 (Feb. 27, 1971).
[16] 36 Fed.Reg. 3860, 3861-3862.
[17] See, e.g., Lukhard v. Reed (1987) 481 U.S. 368, 377,107 S.Ct. 1807, 95 L.Ed.2d 328; Atkins v. Rivera (1986)477 U.S. 154, 162, 106 S.Ct. 2456, 91 L.Ed.2d 131; Connecticut Dept. ofIncome Main. v. Heckler (1985) 471 U.S. 524, 531, fn. 17,105 S.Ct. 2210, 85 L.Ed.2d 577; Heckler v. Turner (1985)470 U.S. 184, 190, fn. 4, 105 S.Ct. 1138, 84 L.Ed.2d 138; Quern v.Mandley (1978) 436 U.S. 725, 737, fn. 12, 98 S.Ct. 2068,56 L.Ed.2d 658.
[18] "Brief of Plaintiffs in Response to Brief of Cross-Appellants [County Boards]," at 16.